STATE of Missouri, Respondent,

v.

Antonio J. TAYLOR, Appellant.

No. 21840.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 11, 1998.

Stephen M. Patton, Asst. Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Kenneth P. Ferguson, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Appellant was charged by information with the class A felony of robbery in the first degree. § 569.020.[1] The information averred Appellant forcibly stole U.S. currency in the possession of Paul C. Miller and in the course thereof, Christopher Swearingin,[2] another participant in the crime, was armed with a deadly weapon.

A jury found Appellant guilty as charged and assessed punishment at twenty years' imprisonment. The trial court entered judgment per the verdict.

Appellant brings this appeal from that judgment. His sole point relied on is:

"The trial court erred in refusing to submit Appellant's offered Instruction 'A' for the lesser included offense of misdemeanor stealing ... in that the evidence provided a basis for an acquittal of robbery in the first degree and a conviction of misdemeanor stealing, in that the jury could have found that Appellant did not act together with Christopher Swearengin to take property from Paul C. Miller at gunpoint, but rather that [Appellant] took U.S. currency from Paul C. Miller without his consent, and did so for the purpose of withholding it from Mr. Miller permanently."

Inasmuch as Appellant does not challenge the sufficiency of the evidence to support the verdict, this opinion sets forth only the evidence necessary to resolve the claim of error.

About 2:00 a.m., July 9, 1996, Miller,[3] a Springfield taxicab driver, was dispatched to "the Howard Street side" of Robberson School in that city to pick up a fare. As he drove north on Howard approaching his destination, Miller saw two men standing "by the parking lot at the back of the school."

Miller stopped at the curb near the men. One of them—Swearingin—entered the front of the cab on the passenger side. The other man—Appellant—entered the back on the passenger side. As Appellant entered, he said he had dropped his cigarettes on the parking lot and was "going to get out to look for them."

1. References to statutes are to RSMo 1994.

2. In the record, this surname is also spelled "Swearengin."

3. For brevity and clarity, this opinion henceforth refers to Paul C. Miller and Christopher Swearingin by their respective surnames.

Miller "turned on the bright lights" and drove from the street into the parking lot. Appellant exited the cab and walked toward its front.

Miller looked toward Swearingin and saw "a gun pointed at my chest." According to Miller, Swearingin said: "Give me your money or I'll blow your f___ head off."

Miller pushed the gun away "a couple of times," but Swearingin "pulled it back and checked the slide." Miller observed the gun was "an automatic type pistol."

Miller had a bank bag lying on the seat. It contained a checkbook and personal items, but no money. Swearingin picked up the bag and ordered Miller out of the cab.

Miller exited the cab on the driver's side. Swearingin exited the cab on the passenger side and walked toward the back. Appellant came toward Miller "from the front of the [cab]."

Miller handed Appellant about $35 that was in Miller's shirt pocket. Asked at trial why he did so, Miller answered: "Well, he was standing right there in front of me. He wanted the money."

Appellant told Miller to turn around and put his hands on top of the cab. Miller complied. Appellant then took Miller's wallet from Miller's back pocket.[4] Meanwhile, Swearingin was standing by the back of the cab about three feet from Miller, pointing the gun at him.

Swearingin told Appellant to turn off the cab's headlights and engine, and to remove the keys from the ignition. Appellant did so. Appellant then "walked" Miller toward the back of the cab.

Swearingin ordered Miller to remove the "coin changer" from Miller's belt and give it to him (Swearingin). Miller complied. The changer contained "between ten and fifteen dollars."

Appellant opened the cab's trunk, using the key. Swearingin ordered Miller to get into the trunk. Miller obeyed. Appellant shut the trunk. Miller heard footsteps as the duo departed.

Miller commenced "banging on the top of the lid and ... yelling, trying to get somebody's attention."

Some two hours later, a Springfield police officer was dispatched to Robberson School in response to a call from someone who heard "yelling from the trunk of a taxicab on the parking lot." As the officer approached the cab, he heard "pounding" on the trunk and a voice inside yelling, "Help, help me."

Using equipment from his patrol car, the officer opened the trunk. Miller got out and told the officer what had occurred.

Subsequent investigation resulted. in Appellant's arrest on August 30, 1996.

At trial, Appellant testified he met Swearingin for the first time about three hours before the robbery, when a friend of Appellant's brought Swearingin to Appellant's apartment.

According to Appellant, he and Swearingin, accompanied by "Pam," "Mindy" and a baby, eventually left the apartment in Pam's car to buy some marijuana. Appellant avowed Swearingin "was the one who knew ... where to get the bud [5] from."

Appellant recounted that after stopping at two different locations—the purposes of those stops are unrelated to any issue in this appeal—the quintet stopped a third time, whereupon Swearingin went to "make a phone call to get the marijuana." Appellant recalled that when Swearingin returned to the car, he said "we'd go to Robberson School to get it."

Continuing his narrative, Appellant told the jurors Pam drove toward the school, but stopped in an alley east of it. Swearingin and Appellant exited the car and walked to the school parking lot.

After "about two minutes," Miller arrived in the taxicab. Appellant avowed Swearingin told him to get in the cab. Appellant asked why. Swearingin (according to Appellant)

---

4. Miller avowed he had about $70 "in bills." We infer that inasmuch as there was some $35 in his shirt pocket, there was also approximately $35 in his wallet.

5. A detective explained "bud" is a "street term" for marijuana.

replied, "[W]e're going to ... go party with these other girls that already have some marijuana over there."

Appellant got into the back of the cab, then discovered his cigarettes were missing. He asked Miller to pull into the parking lot. Miller did; Appellant exited the cab.

After a brief and unsuccessful search for the cigarettes, Appellant walked back toward the cab. He saw "a lot of movement going on" inside and heard Swearingin say: "Give me the money or I'll blow your f____ head off."

Upon hearing that, said Appellant: "I was scared to death. ... I didn't know what to do. I just froze, panicked." Asked why he did not run away, Appellant answered: "Because I didn't know if he was going to turn around and shoot me.... But I wasn't about to take no chance."

Appellant testified that as Miller and Swearingin exited the cab, Appellant told Swearingin: "I'm not in this with you."

Describing what occurred next, Appellant explained that he went to the driver's side of the cab where Miller was standing; Swearingin "came around the back side" and joined them, holding the gun to Miller's head. At that time, said Appellant, Swearingin told Miller to give Appellant "the money." Miller reached inside his shirt pocket, took money out, and gave it to Appellant. Appellant swore he put the money on the hood of the cab. Asked whether he ever demanded money from Miller, Appellant replied: "No, not any time, no."

Appellant's account continued:

"[Swearingin] told me to reach ... in the car and get the keys and turn off the car and the lights[.] [I did.] [Swearingin] told Mr. Miller to turn around and put his hands on the car. I never told [Miller] any such thing. [Miller did as he was told.] [Swearingin] told me to get [Miller's] wallet. [I did.] I [handed] it to ... [Swearingin].

[Swearingin still had the gun in his right hand, pointed at Miller.] Miller ... turned around and [Swearingin] demanded the ... changer belt around his waist[.] [Miller gave it to Swearingin.]

[Swearingin] told me to go back and pop the trunk. [I did.] [Swearingin] brung [Miller] back there and ordered him to get in the trunk. [Miller] did. I ... took my hand ... and ... pushed his head down so ... the trunk lid wouldn't hit him in his head while the trunk was being shut.

[Swearingin] closed the trunk. [The keys] was still in the keyhole[.]

[After Swearingin closed the trunk, he] put the gun away. He took [the keys] and threw them over the ... fence ... by the school yard. [As Swearingin did this], I told him I was not in this with him. I told him twice[.]

[While the robbery was taking place], I was scared to death of [Swearingin because] he had a gun at the time. I just met him. If he'd rob a taxi man, there ain't no telling what he would have did[.]"

During the instructions conference, Rule 28.02(e), Missouri Rules of Criminal Procedure (1997), the trial court announced it would submit the case to the jury by a verdict-directing instruction hypothesizing that Appellant acted together with Swearingin in robbing Miller. *See:* MAI–CR 3d 304.04 (7–1–97). At Appellant's request, the trial court stated it would give the jury a "duress instruction" hypothesizing that if the jury found Appellant acted together with Swearingin in robbing Miller, the jury must decide whether Appellant acted under duress. *See:* MAI–CR 3d 310.24 (1–1–87) and § 562.071.[6]

Appellant asked the trial court to give a verdict-directing instruction hypothesizing that Appellant committed "misdemeanor stealing." *See:* MAI–CR 3d 324.02.1 (10–1–95). The tendered instruction read, in pertinent part:

6. Section 562.071 reads, in pertinent part:

"1. It is an affirmative defense that the defendant engaged in the conduct charged to constitute an offense because he was coerced to do so, by the use of, or threatened imminent use of, unlawful physical force upon him ..., which force or threatened force a person of reasonable firmness in his situation would have been unable to resist.
...."

"If you do not find the defendant guilty of robbery in the first degree as submitted in Instruction No. ___, you must consider whether he is guilty of misdemeanor stealing.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about the 9th day of July, 1996, in the County of Greene, State of Missouri, the defendant took U.S. currency, property in the possession of Paul Miller, and

Second, that the defendant did so without the consent of Paul Miller, and

Third, that defendant did so for the purpose of withholding it from the owner permanently,

then you will find the defendant guilty of misdemeanor stealing.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

. . . ."

The trial court marked the tendered instruction as "Instruction No. A" and refused it.

Section 556.046 reads, in pertinent part:

"1. A defendant may be convicted of an offense included in an offense charged in the . . . information. An offense is so included when

(1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

. . . .

2. The court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense."

Citing *State v. Williams,* 708 S.W.2d 705, 708[5] (Mo.App. E.D.1986), and *State v. Holmes,* 613 S.W.2d 664, 665–66[2] (Mo.App. E.D.1981), Appellant asserts misdemeanor stealing is a lesser included offense in robbery in the first degree. Continuing his argument, Appellant relies on *State v. Garner,* 800 S.W.2d 785, 788[7] (Mo.App. E.D. 1990), for the proposition that a trial court must submit a lesser included offense instruction if the evidence arguably shows a lack of an essential element of the greater offense, thus affording a basis for conviction of the lesser.

In the instant case, says Appellant, the jury could have reasonably found from his testimony that (a) he did not know Swearingin was going to rob Miller, and (b) he—Appellant—was forced to participate in the robbery because he feared Swearingin. According to Appellant, the trial court should have given Instruction A, thereby allowing the jurors "to decide whether [Appellant] acted as a participant in an armed robbery with [Swearingin], or whether [Appellant] simply took the money from . . . Miller at [Swearingin's] direction."

Appellant's analysis is awry. The flaw in his theory is that all of the evidence (including Appellant's own testimony) established that Miller allowed Swearingin and Appellant to take the money only because Swearingin was armed with the handgun and threatened to shoot Miller if Miller did not surrender the money. There was no evidence to support a finding that the theft of Miller's money was accomplished by any means other than Swearingin's threat of immediate use of the gun against Miller. Consequently, there was no evidence to support a finding that anyone (including Appellant) committed the crime of misdemeanor stealing.

Analogous circumstances are found in *State v. Olson,* 636 S.W.2d 318 (Mo. banc 1982). There, the accused was convicted by jury of sundry crimes including assault in the first degree. *Id.* at 319. On appeal, he assigned error in the trial court's failure to instruct the jury on lesser degrees of assault. *Id.* at 320. Applying § 556.046.2,[7] the Supreme Court of Missouri rejected the claim, pointing out that the accused maintained he did not engage in any of the conduct about which the victim complained. *Id.* at 322. Consequently, reasoned the Supreme Court,

7. Section 556.046.2 (quoted earlier in this opinion) has remained unchanged since *Olson.*

there was no evidence that would provide a basis for *both* an acquittal of assault in the first degree *and* a conviction of assault in a lesser degree. *Id.*[8]

The rationale of *Olson* applies in the instant case. The uncontroverted evidence established that Miller was the victim of robbery in the first degree. The issue the jury had to decide was whether (1) Appellant voluntarily participated with Swearingin in committing that crime, or (2) Appellant followed Swearingin's directives because Appellant feared the imminent use of unlawful physical force against him by Swearingin if he refused, and a person of reasonable firmness in such a situation would have been unable to resist Swearingin's commands.

Appellant's testimony provided a basis for the jury to find scenario 2. However, if (as the verdict demonstrates) the jurors disbelieved Appellant's testimony that he was "scared to death" of Swearingin because "there ain't no telling what he would have did," Appellant was guilty of robbery in the first degree. Consequently, while there was a basis in the evidence for acquitting Appellant of robbery in the first degree, there was no basis in the evidence for convicting him of any lesser offense.

Appellant's theory seems to be that (a) the jurors could have reasonably found he did not know Swearingin was going to rob Miller until he (Appellant) heard Swearingin demand Miller's money and threaten to blow Miller's "f____ head off," and (b) such a finding would have exonerated Appellant of robbery in the first degree while providing a basis for convicting him of misdemeanor stealing.

Appellant cites no authority supporting such a theory. We reject it.

Assuming, arguendo, that Appellant did not plan the robbery with Swearingin and was unaware Swearingin intended to commit it until Swearingin demanded Miller's money at gunpoint (a hypothesis the jurors were not obliged to accept), Appellant had three options at that juncture: (1) he could voluntarily act together with Swearingin in committing the robbery, (2) he could refuse to participate in the robbery, thereby leaving Swearingin as the lone culprit, or (3) if Appellant perceived a threat of imminent use of unlawful physical force upon him if he refused to aid Swearingin in the robbery, and if a person of reasonable firmness in Appellant's situation would have been unable to resist the threat, Appellant could obey Swearingin's orders and escape criminal liability by reason of § 562.071.1.[9] However, if Appellant chose option 1, he could not thereafter claim the jury could properly find him guilty of only misdemeanor stealing merely because he did not plan the robbery with Swearingin.

Appellant's point relied on is denied.

Judgment affirmed.

PREWITT, P.J., and PARRISH, J., concur.

---

8. A holding in *Olson* on a different issue was overruled by *State v. Santillan,* 948 S.W.2d 574, 576[5] (Mo. banc 1997).

